[Crim. No. 5668.   Second Dist., Div. Two.   Dec. 27, 1956.]

THE PEOPLE, Respondent, v. ELLWOOD MARTIN MUELLER, Appellant.

*Assigned by Chairman of Judicial Council.

Ball, Hunt & Hart and Clark Heggeness for Appellant.

Edmund G. Brown, Attorney General, and Joan D. Gross, Deputy Attorney General, for Respondent.

ASHBURN, J.—Defendant, having been charged with assault with a deadly weapon upon one Dene Qualls (Pen. Code, § 245), was convicted and sentenced to serve three months in the county jail. He appeals from the judgment and an order denying his motion for new trial. Prejudicial errors in the

matter of instructions and misconduct of the deputy district attorney are asserted.

Assault was immediately followed by a vicious battery which inflicted serious injuries upon Qualls. While no claim is made of insufficiency of the evidence to support the verdict, the evaluation of the alleged errors requires a brief summarization of the evidence, which is sharply conflicting upon the central question of whether defendant started a fight or acted in self-defense.

On August 11, 1955, a group of five colored laborers were working upon the foundation of a building which was being constructed for Superior Overhead Garage Door Company, in the city of Compton. It had a collective bargaining agreement which covered and included Laborer's Local Union 507 of Long Beach, and which required that the workmen be union members. A subcontract had been let to Tom Erland, who claimed to the Door Company officials that he was employing union men. He had five colored laborers on the job and they did not belong to the union. About three days before August 11th a union picket was placed in front of the premises; he belonged to Local 507. In the early morning of that day the men were finishing their job when a former workman came to the property, talked with the picket and left. Soon a group of six field representatives of Local 507 arrived, led by defendant Mueller who was business manager of said Local. There were stakes lying on the ground which had been used to support foundation forms. According to the version of the prosecution witnesses defendant and his group picked up stakes as they approached the workmen. Their foreman was Pearson Petty; he met defendant and his group, asked what they wanted, and Mueller replied that it was not any of their business. Petty asked, "What are you doing on this property?" and Mueller started walking away. Petty then said, "Look, we don't want any trouble here." Mueller: "Well, I'm going to give you plenty of trouble." Petty: "I'll call the police." Mueller: "You don't know who I am, I might be the police. I'm going to give you plenty of trouble and put you in jail besides." One Evans was close to Mueller and as they raised their clubs Petty, according to his own version, ran to the truck and got a shovel to use as protection. According to other witnesses he started toward the street as if to telephone the police. When he left, Qualls, who was subforeman, started toward defendant. He had been using a trowel but had nothing in his hands and made no

threat of any kind. Before he said anything Evans hit him from behind with a two-by-four stake, the blow landing on his shoulder. Evans then grabbed him and held his arms behind him. Thereupon defendant beat him across the head with a one-by-three piece of timber, striking him six or seven times, inflicting an open wound above the ear which bled freely. While this was going on other workmen ran to their truck to get shovels or other instruments of protection. Some got shovels, one a mattock, another two hammers. As they returned toward Qualls and Mueller, Petty and Morrah kept saying, "Dene, don't fight back. Don't fight back. You fellows please go, we don't want any trouble." As the shovel brigade neared them, Evans dropped Qualls who fell to his knees. Mueller and his group ran for his car and departed for the Union hall. In about 20 or 30 minutes they returned with about 15 men but the police were on the scene and no further violence occurred. The prosecution witnesses agreed that none of them had struck a blow or made a threat of any kind before defendant attacked Qualls; that Qualls did not start the fight and had nothing whatever in his hands when approaching Mueller. In substance the foregoing is the testimony of the five laborers, Qualls, Jones, Morrah, Abrams and Petty.

The defense version of the trouble was quite different. Mueller did hit Qualls several times with a stick but only in self-defense after Qualls had hit him with a shovel. According to the defense witnesses Mueller and his associates, though they conversed with the picket, did not know that the colored laborers were not union men. These union representatives were engaged in checking jobs that morning. They went to this one for the purpose of checking the men's cards and to ask about Jace Marshall's insurance, if perchance he was there; he was not. Mueller and Evans entered the job first. Mueller identified Petty as foreman, presented his building trades card, said he was there to check the job and to talk to Marshall if he was there. Forthwith Petty, the foreman, became violent, ordered Mueller off the job, using many nasty words. "He told me that they wasn't any so-and-so union man going to check that job and for us to get off the job." Mueller walked away from Petty, who was still calling the union men S. B.'s and ordering them off the property. As he did so, Brimhall yelled to him to watch out. Defendant turned and saw Qualls coming at him with a shovel, swinging it. He tried to dodge the blow but was knocked to the ground

on one knee. He grabbed a stake as he went down and came up swinging it. Qualls was trying to hit him with a shovel but he dodged those blows and hit Qualls several times on the head, "trying to stop his advance on me." Defendant called to Evans for aid. Evans grabbed Qualls, held his arms and Mueller did not strike Qualls any more. By that time other laborers were approaching with shovels and "were all screaming and hollering to kill them." Petty hit Evans on the head with a shovel, then ran for the truck saying he had a gun in it and was going to "kill all of us union . . . [S. B.'s] if we didn't get off the job." Brimhall then asked the Petty group to please stop using shovels and "that we would get off of the job, and they was one of the colored boys that agreed to that, so everybody dropped everything they had in their hands," and the union group left. Such was the version of the defense witnesses as furnished by Mueller, Evans, Scharer, McGinnis (four of the six union men who had arrived together at the job), and one O'Malley who was working on adjoining property.

Obviously the jurors adopted the version of the facts which had been presented by the prosecution witnesses.

The first claim of error is refusal to give the following instruction which was requested by defendant: "You may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, [or of an attempt to commit the offense], if in your judgment, the evidence supports such a verdict under my instructions.

"To enable you to apply the foregoing instruction, if your findings of fact require you to do so, I instruct you that the offense of assault with a deadly weapon, of which the defendant is charged in [count . . . . . . of] the information, necessarily includes the crime[s] of assault and battery." The judge in refusing it endorsed the following words: "Assault & battery not included either as a matter of fact or matter of law."

Appellant argues that the judge was mistakenly relying upon cases such as *People* v. *McCoy,* 25 Cal.2d 177, 187 [153 P.2d 315], which hold that it is not necessary to give an instruction on a lesser offense when the evidence establishes that defendant was guilty of the greater one as charged or not guilty of any crime. It appears more probable that the ruling rests upon the principles stated in Fricke on California Criminal Law, Fifth Edition: "It has been said that 'The

test in this state of a necessarily included offense is simply that where an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense.' (*People* v. *Greer,* 30 Cal.2d 589 [184 P.2d 512].) 'If, in the commission of acts made unlawful by one statute, the offender must always violate another, the one offense is necessarily included in the other' (*People* v. *Whitlow,* 113 Cal.2d 804 [249 P.2d 35]; *People* v. *Krupa,* 64 Cal.App.2d [592] 598 [149 P.2d 416]). Before a lesser offense can be said to constitute a necessary part of the greater, all of the elements of the corpus delicti of the lesser offense must be included in the elements of the greater offense (*People* v. *Whitlow, supra; People* v. *Greer,* 30 Cal.2d 589 [184 P.2d 512].)'' (P. 36.) ▮ ''A charge of assault with a deadly weapon does not include battery (*People* v. *Helbing,* 61 Cal. 620; *People* v. *McCaffrey,* 118 Cal.App.2d 611 [258 P.2d 557]) or the offense (Pen. Code, § 417) of exhibiting a deadly weapon in an angry and threatening manner (*People* v. *Diamond,* 33 Cal.App.2d 518 [92 P.2d 486]; *People* v. *Piercy,* 16 Cal.App. 13 [116 P. 322]).'' (P. 38.) The cited cases of Helbing and McCaffrey support the text, holding that the offense charged under section 245, Penal Code, does not include battery; that that is not an element of the offense of assault with a deadly weapon. (See also *People* v. *McDaniels,* 137 Cal. 192, 195 [69 P. 1006, 92 Am.St.Rep. 81, 59 L.R.A. 578].)

In the McCaffrey case this court said, at page 618: ''Simple assault is nothing more than an unlawful attempt to commit a violent injury on another. (Pen. Code, § 240.) ▮ A battery cannot be committed without assaulting the victim. But an assault can occur without committing a battery. ▮ The gravamen of the crime defined by section 245 is *the likelihood that the force applied or attempted to be applied* will result in great bodily injury. ▮ Therefore, to make one guilty of violating section 245, evidence of an actual blow is not necessary; but it is requisite that proof be made of an attempt to beat another (1) with a deadly weapon or other instrument not ordinarily defined as a deadly weapon, or (2) by a means or with a force likely to produce great bodily injury. Because a battery is not essential to the crime here charged and because one may violate section 245 without actually striking another, a battery is not a 'necessarily' included offense in the crime defined by section 245. Therefore, the trial court properly refused to give defendant's

instructions IV and V. (*People* v. *Meichtry,* 37 Cal.2d 385, 390 [231 P.2d 847].)'' (*People* v. *McCaffrey,* 118 Cal.App.2d 611, 618 [258 P.2d 557].)

██ The tendered instruction was erroneous in that it told the jury that the offense of assault with a deadly weapon necessarily includes ''the crimes of assault and battery.'' If the request had been confined to assault, with no reference to battery, a different question would arise. But it is unnecessary to inquire whether refusal of such request would have been error, for the evidence of simple assault is too tenuous to require the court to modify the instruction and to give it as modified upon its own motion. (See *People* v. *Warren,* 16 Cal.2d 103, 117 [104 P.2d 1024].)[1]

██ Appellant argues that there was prejudicial error in the giving of the following instruction: ''No words of abuse, insult or reproach addressed to a person or uttered concerning him, howsoever grievous or opprobrious the words may be, if unaccompanied by any threat of great bodily injury or any assault upon the person or any trespass against lands or goods, will justify him in an assault with a deadly weapon and the provocation only of such words will not constitute a defense to a charge of having committed such an assault.'' Counsel argue the matter as one of error in a self-defense instruction. It does not fall in that category, however, for it deals only with justification or excuse for assault with a deadly weapon. It correctly states the law to be that mere words will not justify such an assault. (5 Cal.Jur.2d § 13, p. 233; *People* v. *Iams,* 57 Cal. 115, 126-127, 130, 120; *People* v. *Washburn,* 54 Cal.App. 124, 128 [201 P. 335]; *People* v. *Westlake,* 62 Cal. 303, 305-306; 6 C.J.S. § 91, p. 943; 4 Am. Jur. § 53, p. 154.)

---

[1]In the case of *People* v. *Fuentes,* 74 Cal.App.2d 737 [169 P.2d 391], which is cited by appellant, the court held the evidence insufficient to sustain conviction of assault by means of force likely to produce great bodily injury, but at page 742 it said: ''This conclusion does not relieve defendant from the results of his admitted and unprovoked assault on Garcia. There can be no question that he is guilty of the crime of battery and that he should receive punishment therefor. As battery is a crime included in the one charged we may reduce the judgment and direct the resentence of defendant. (*People* v. *Kelley,* 208 Cal. 387 [281 P. 609]; *People* v. *Cowan,* 38 Cal.App.2d 231 [101 P.2d 125, 135].)'' The cited cases support the proposition that an appellate court in such circumstances may reduce the judgment and direct a resentencing of the defendant upon a necessarily included offense, but they do not support the statement that ''battery is a crime included in the one charged,'' namely, assault by means of force likely to produce great bodily injury. In this respect the Fuentes case is out of line with the views heretofore expressed by the Supreme Court.

Counsel for appellant place mistaken reliance upon *People* v. *Valentine*, 28 Cal.2d 121, 144 [169 P.2d 1], which deals not with words as provocation for an assault, but with the question of whether provocatory words ''are of themselves sufficient to reduce the offense of an intentional homicide with a deadly weapon from murder to manslaughter'' (p. 137) as a matter of law; it being held a question for the jury to decide whether the facts were sufficient to show that defendant acted under the heat of such passion as would naturally be aroused in an ordinarily reasonable person. Such cases deal with the state of defendant's mind and the effect of provocatory words upon it. That is not the problem here, which is the bald one of whether words alone will justify an assault with a deadly weapon. The instruction of which appellant complains is CALJIC Number 606. The 1953 pocket part contains the following apt discussion of the matter. ''In *People* v. *Valentine*, 28 Cal.2d 121 [169 P.2d 1], the Supreme Court of California establishes the rule that words of abuse, insult or reproach may incite the heat of passion specified in Penal Code, section 192 (Manslaughter Defined), and hence may constitute sufficient provocation to reduce the offense of intentional homicide from murder to manslaughter. . . . The law thus announced in *People* v. *Valentine* has to do merely with the reduction of a homicide from murder to manslaughter, not with a total defense to or justification of homicide, or of any other attack upon the body. Penal Code, sections 692, 693 and 694 state when an assault is justifiable and not a crime. Provocation by words of abuse, insult or reproach is not among the listed circumstances. The purpose of this Instruction 606 is to state the effect of the clear statutory law.'' (P. 163.) There was no error in giving the instruction at bar.

Failure to give appropriate instructions upon circumstantial evidence of the court's own motion is claimed to be prejudicial error here. Counsel rely upon cases holding that such instructions are imperative in a trial where the prosecution relies solely or substantially upon circumstantial evidence to convict. Obviously this limitation to a case involving substantial reliance upon that type of evidence is necessary because every trial presents some circumstantial evidence, that being but another name for indirect evidence, which in turn means inferences or presumptions. (See definitions in 18 Cal.Jur.2d § 12, p. 434.) The governing rule is thus stated in *People* v. *Lapara*, 181 Cal. 66, 70 [183 P. 545] : ''It is not now open to question that in a criminal case in which

the prosecution relies for conviction upon direct evidence, the circumstantial evidence, if any, being merely incidental to and corroborative of the direct evidence, an instruction on the law of circumstantial evidence need not be given, and that, in such case, it should not be intimated to the jury that the case of the people is one of circumstantial evidence. [Citations.] The reason for the general rule in this behalf is to be found in the danger of misleading and confusing the jury where the inculpatory evidence consists wholly or largely of direct evidence of the crime. In such cases, as courts have repeatedly pointed out, it would be most mischievous to intimate to the jury that the prosecution was relying for a conviction upon circumstantial evidence.'' To the same effect are: *People* v. *Jerman,* 29 Cal.2d 189, 197 [173 P.2d 805] ; *People* v. *Alexander,* 92 Cal.App.2d 230, 235 [206 P.2d 657] ; *People* v. *Arias,* 118 Cal.App.2d 656, 659 [258 P.2d 535] ; *People* v. *Shaheen,* 120 Cal.App.2d 629, 637, 638 [261 P.2d 752] ; *People* v. *Brophy,* 122 Cal.App.2d 638, 646 [265 P.2d 593] ; *People* v. *Van Eyk,* 133 Cal.App.2d 562, 567 [284 P.2d 970] ; *People* v. *Harmon,* 89 Cal.App.2d 55, 59, 60 [200 P.2d 32].

The instant conviction rests upon direct evidence furnished by witnesses and presents circumstantial proof only in the incidental and corroborative circumstances which give meaning and force to the positive testimony. The claim of error in this regard is not well taken.

Lastly it is argued that there was misconduct of the deputy district attorney of such magnitude that the court's prompt admonition to the jury could not cure it. During the opening argument the following occurred: Mr. Jackson: ''. . . Now, here is six men there, and five poor colored fellows. But listen to the testimony of the defendant's witnesses. What did they have to say? They arrived at the scene, they're just passing by looking for some fellow named Jason Marshall, works around there. Also going to check on the job there to see. Of course, what the evidence, what are the presumptions of the picket-man out there. Already they know it is not union. They go back there with six of them just to check on it. We have heard a lot of stories about how unions operate goon-squads——Mr. Sokol: To which we will object and ask the Court to advise the jury to disregard that statement. (Record read by the reporter.) The Court: That argument should not have been made. The jury is instructed to entirely disregard it. The sole question we have here,

regardless of everything else, is whether or not the defendant committed an assault or whether he was acting in self-defense. You may proceed. MR. JACKSON: I'm sorry.''

Counsel for appellant argue that these were highly inflammatory statements, that the district attorney was clearly seeking to convict defendant upon the prejudice that many persons undoubtedly feel toward unions and union workers, and upon prejudice in favor of a "poor colored worker" trying to hold the job. It appears, however, that the whole trial had the atmosphere of a battle between a group of non-union Negroes and a delegation of white union representatives. The prosecution witnesses claimed the union men were bent on driving them off their jobs and the union group asserted that they were being assaulted and chased away. The remarks of the district attorney characterized defendant's activities in a manner which was not far removed from the evidence furnished by the prosecution witnesses. That the jurors were not carried away by extraneous considerations or by passion seems apparent. They retired to consider their verdict at 9:42 a. m.; at 11:30 they returned to court with two questions for the judge, which went to the heart of the case, and a further request to have the testimony of Qualls and Mueller read to them. The questions were, "at what time was Mr. Qualls held?" and "who struck the first blow?" Of course the court told them it was their business to answer both. The requested testimony was read and the jurors again retired at 3:10 p. m., returning with their verdict of guilty at 4 p. m.

Upon hearing of the motion for new trial, at which defendant's counsel made the same arguments of misconduct; the trial judge said: "I think that was a somewhat intemperate remark, but I don't think it was one of those improprieties which could not be removed by the instruction of the Court." Primarily it was his duty to determine whether there had been a miscarriage of justice, and denial of the motion for new trial furnished a negative answer to that question. We in turn cannot conclude that this is a case in which a miscarriage of justice has been worked. ■ *People* v. *Watson*, 46 Cal.2d 818, 836-837 [299 P.2d 243]: "That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. . . . Nevertheless, the test, as stated in any of the several ways, must necessarily be based upon reasonable probabilities rather than upon mere possibili-

ties; otherwise the entire purpose of the constitutional provision would be defeated.'' It does not appear that in the absence of the incident under discussion it is reasonably probable that a result more favorable to the defendant would have been reached.

The judgment and the order denying motion for new trial are affirmed.

Moore, P. J., and Fox, J., concurred.

A petition for a rehearing was denied January 11, 1957, and appellant's petition for a hearing by the Supreme Court was denied January 23, 1957.