[Crim. No. 7326. Second Dist., Div. Two. Feb. 9, 1961.]

## THE PEOPLE, Respondent, v. VINCENT JOHN ZANKICH, Appellant.

Raymond Choate for Appellant.

Stanley Mosk, Attorney General, and George W. Kell, Deputy Attorney General, for Respondent.

ASHBURN, J.—Appeal from conviction of second degree murder. Appellant does not claim insufficiency of the evidence but relies upon errors in rulings upon evidence and in giving or refusing instructions.

About 11 p. m., on January 24, 1960, deceased, Dr. Quattelbaum, with three companions (Mrs. Beverly Burton, Mr. Burton and Virginia Patridge), was at the Baby Doll Bar in San Pedro, drinking some beer and playing a bowling machine. An employee of the bar, Jane Morrison, noticed defendant and Quattelbaum facing each other, about two feet apart, with the

doctor's back to the wall; he was then standing in a narrow space between the bowling machine and a juke box. She called out, "There will be no damned fighting in here," turned her back for a moment and then looked again at the doctor who was sinking to the floor; Zankich had walked away and was standing in front of the juke box.

Mrs. Burton's attention was attracted by some sound she was unable to identify and, looking in decedent's direction, she saw him standing about 5 feet from her, back to the wall, with a very surprised, dazed look on his face. Then he slowly sank to the floor without putting out a hand to protect himself and ended in a sitting position, then slowly he went over onto his left side without striking his head. Eyes and mouth were wide open.

Mr. Burton gave substantially the same story and added that he heard no angry words spoken, the juke box was playing. He also said the doctor was unconscious as he sank to the floor.

Virginia Patridge heard decedent say in a surprised voice something like "What's this?" just before slumping to the floor. Defendant was then closer to decedent than any other person and was facing him, 2 to 3 feet away.

Something attracted the attention of Jesse Martinez to the vicinity of the juke box where the doctor was. He heard a thud which sounded like a person getting hit, a loud smack such as he had heard in street fights when a person got hit in the face. He illustrated it by striking his right fist into the open palm of the other hand. Defendant, as the doctor slumped to the floor, was standing right in front of him 3 or 4 feet away and was "kind of leaned over looking at the doctor" with his arms at his sides and head bent over, illustrating. "THE COURT: Bending forward a little with his arms apparently down to his sides and his head bowed a little." "Q. But his arms were down as you illustrated to us? A. Maybe a little bit higher. They was not down at his sides, but they was not up either. Q. They were below his waist, weren't they? A. Yes. Q. And were his fists clenched or were his hands open? A. I really didn't notice." Martinez grabbed him by the waist, said "What the hell is wrong?" and spun him around facing in the opposite direction. Defendant then left, saying he would see Martinez in the morning.

Defendant did not testify. His counsel relied principally upon the testimony of one Gaddis, a mail carrier, who said he saw Martinez and Zankich facing toward the juke box and

that the doctor had both hands to his head, illustrating. The court interpreted his demonstration as follows: "In the first instance, his hands were somewhat away from his forehead, and in the last instance the tips of his fingers were apparently touching his forehead, but the heels of his hands were somewhat away, leading out from the face. Is that correct, Mr. Gaddis? THE WITNESS: That is correct." Gaddis on cross-examination also told about a statement he made to Police Lieutenant Case: "Q. Did you tell him in effect, 'I was in the Baby Doll and I saw the fellow that got hurt standing up against the wall. Zankich and Jesse were standing in front of him and it appeared that he got hit. The fellow then slumped to the floor'? A. Well, I said something like that, but I don't believe I said those exact words. Q. Did you make any statement—— THE COURT: Is that the substance of what you told the officer, without regard to the exact words? THE WITNESS: That is the substance." On redirect he testified he did not see the doctor get hit. Also: "Q. Well, when you talked to Lieutenant Case, were you just assuming that the doctor had been hit? A. Well, I probably was, yes, sir. Q. There was some talk about it around the bar, wasn't there, after it happened? A. Yes, there was quite a bit of talk."

Dr. Quattelbaum apparently died on the way to the hospital. The autopsy revealed that decedent had an abnormally thin skull which had been fractured, the fracture being about three inches long, involving the left temporal bone and extending into the floor of the frontal fossa. This fracture had been induced by trauma but there was no displacement. The immediate cause of death, according to the autopsy surgeon, Dr. Don H. Mills, was acute subarachnoid hemorrhage, due to subarachnoid arterial rupture, stress induced. This involved an area at the base of the brain described as the "Circle of Willis," where blood vessels spread out in a fan-shaped distribution on the under-surfaces of the brain. The fracture itself did not cause the hemorrhage. The hemorrhage resulted because of a rupture of some defect within one of the blood vessels. This was due to internal pressure which could be caused by emotional tension, stress, shock, etc. A rupture of the blood vessel, such as occurred in this case, can happen during normal activity, even during sleep. A blood-alcohol reading was taken from Quattelbaum's blood and was found to be .16 per cent, indicating that Quattelbaum was probably under the influence of alcohol at the time of his

death. The presence of alcohol in the blood stream causes fluctuations in blood pressure.

Dr. Cyril B. Courville, a neurologist and neuropathologist, testified that in his opinion the blow which caused the fracture was apparently the cause of the stress, which in turn caused the vessel's rupture.

The defense relied upon testimony of Dr. Frank Polmeteer, specialist in neurology and neurological surgery, who expressed the opinion that trauma had nothing to do with the man's death. But he also said that the cause probably was a rupture in the posterior fossa which a rise in blood pressure could cause; that the difficulty started when the doctor held his head, thus indicating a headache; that a blow, like emotional stress and strain, would increase the blood pressure. "Q. Now, supposing somebody took a swing at you and missed but came real close out of a clear blue sky (demonstrating). . . . Would that raise a person's blood pressure? A. Yes. Q. Could that raise the blood pressure sufficient to burst a weak point in the blood carrying system? A. I think it could. Q. Particularly as it is unexpected and uncalled for? A. I think so. . . . I think it was like you described earlier, the apprehension and the stress was the thing that caused the rupture of the vessel. . . . Q. Well, suppose that the traumatic episode was, as you say, 'incidental'—— A. Is what? Q. Incidental—I'm quoting you now—but the fact that he was attacked in that manner, would that have raised the blood pressure, in your opinion, to a sufficient point to burst this anomalous blood vessel? A. I think it could. Q. And do you think with a reasonable medical certainty that is the cause of the bursting of the blood vessel? A. It might very well have been."

As previously pointed out appellant makes no claim of insufficiency of evidence. In order to appraise his major claim of error—admission of evidence of unprovoked batteries committed by him upon other persons within 24 hours preceding the Quattelbaum incident—certain preliminary observations should be helpful. The fact of a blow struck by defendant is shown circumstantially; no one saw it. Absence of provocation depends upon the same type of evidence, negative in character—no one heard any angry or insulting words or saw any provocative gesture. The malice of second degree murder is implied, defined in section 188, Penal Code, as follows: "It is implied, when no considerable provocation appears, or when the circumstances attending the killing show

an abandoned and malignant heart.'' ▮▮ Absence of considerable provocation or circumstances attending the killing which show an abandoned and malignant heart—either of these elements—suffices to prove implied malice, and absence of provocation, once it is shown directly or circumstantially, may afford sufficient basis for a further inference of an abandoned and malignant heart. (*Cf. People* v. *Cole*, 47 Cal.2d 99, 106 [301 P.2d 854, 56 A.L.R.2d 1435].) ''One who commits an act with disregard of the fact that he is thereby endangering and likely to cause the loss of human life, there being no adequate provocation, justification or excuse, evidences an abandoned and malignant heart and the malice necessary to constitute murder is implied if the death of a human being results.'' (Fricke on California Criminal Law, 7th ed., p. 147.) ▮▮▮ Webster's New International Dictionary, 2d ed., gives as one of the definitions of ''abandon'': ''4. To give (oneself) up without attempt at self-control; to yield (oneself) unrestrainedly; as, to *abandon* oneself to grief; to *abandon* oneself to vice''; and ''malignant'' as: ''4. Disposed to do harm, inflict suffering, or cause distress; virulently inimical; bent on evil; malicious.'' ▮▮▮ Malice aforethought (Pen. Code, § 187), ''denotes purpose and design in contradistinction to accident and misfortune.'' (25 Cal.Jur.2d, § 40, p. 535; *People* v. *Berry*, 44 Cal.2d 426, 430 [282 P.2d 861].)

▮▮▮ The construction of the evidence most favorable to defendant would present a case falling within the rule stated in 25 California Jurisprudence 2d, section 107, page 619: ''Where a homicide is proved to have been committed by the defendant and nothing further is shown, the presumption of law is that it was malicious and an act of murder, but only of the second degree. Thus, where there is no satisfactory evidence of premeditation, where the circumstances surrounding the actual act of killing are undisclosed, and where the killing was not committed in the perpetration of, or attempt to perpetrate, one of the felonies listed in Penal Code, § 189, the defendant should be found guilty of second degree murder.'' This statement is supported by numerous authorities. See *People* v. *Howard*, 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385]; *People* v. *Bender*, 27 Cal.2d 164, 178 [163 P.2d 8]; *People* v. *McGee*, 31 Cal.2d 229, 234 [187 P.2d 706]; *People* v. *Craig*, 49 Cal.2d 313, 319 [316 P.2d 947]; *People* v. *Ross*, 34 Cal.App.2d 574, 578 [93 P.2d 1019]; *People* v. *Cowan*, 38 Cal.App.2d 231, 248 [101 P.2d 125, 135]; *People* v. *Cardoza*, 57 Cal.App.2d 489, 494 [134 P.2d 877]; *People* v.

*Hopper,* 145 Cal.App.2d 180, 189 [302 P.2d 94]; *People* v. *Steward,* 156 Cal.App.2d 177, 185 [318 P.2d 806].

The prosecutor was not obligated to rest upon the presumption just mentioned or the circumstantial showing above reviewed; he was warranted in corroborating through any legitimate further showing.　█　 *People* v. *McMonigle,* 29 Cal.2d 730, 742 [177 P.2d 745]: "The quantum of evidence, if it is *relevant* to a fact in issue, does not enter into the question of its admissibility. Speaking to this point, the court in *People* v. *Cook,* 148 Cal. 334, said at page 340 [83 P. 43]: 'The prosecution in a criminal case is not obliged to rest upon evidence which merely establishes the guilt of the defendant *prima facie*—upon evidence, that is to say, which is merely sufficient in law to sustain a verdict of guilty. The guilt of the defendant must be proved beyond a reasonable doubt in order to secure such a verdict, and the district attorney not only may, but ought to, introduce all proper evidence at his command tending to establish the guilt of the defendant, in order to overcome any doubts or scruples of the jurors.' " To the end of thus strengthening his case the prosecutor offered and the court received over defendant's vigorous and repeated objections evidence of incidents occurring only a few hours prior to the Quattelbaum battery which took place about 11 p. m. on January 24, 1960.

James Giles, a 20-year-old soldier, testified that on January 24, 1960, at about 1 to 1:30 a. m., he and two other soldiers, Bobby Holmes and Oliver Farley, were seated in a booth in the Hamburger Hut when Zankich and another man asked to sit with them; they were invited to sit down and Giles asked Zankich, who was seated across the table from him, if he wanted some coffee or something; receiving an affirmative answer Giles turned and called to the waitress and told her to bring coffee. As he turned back to the table defendant Zankich arose and reaching across the table hit Giles in the nose with a blow that broke it. No words were spoken. There were several other blows which Giles tried to block. He and defendant were in the aisle when these latter blows were delivered and the table was knocked over onto Holmes' lap. While he was trying to get it off him defendant turned and said "you look like you want some of it" or something like that. Holmes' back was to him, as he looked around Zankich was swinging at him, he protected himself as best he could with his arm but he was hit three or four times on the head and received a cut on the eye which required three stitches and

left a scar that he showed the jury. Zankich also tried to kick Holmes once while the latter was still seated but Holmes caught his foot and pushed it back. He then said, "your eye is busted" or something to that effect, and started for Giles again. At mention of the police Zankich and his friend left.

Of course the proof of these wholly unprovoked batteries would have a profound effect upon the jurors, and error in receiving it, if any there were, would be definitely prejudicial. This poses a difficult question but we have concluded that the judge did not err in receiving this evidence for the limited purpose which he repeatedly explained to the jury—as some evidence tending to show absence of provocation for the assault upon Dr. Quattelbaum and the infliction of same in a manner showing an abandoned and malignant heart. Though the judge did not so state, the testimony was also competent evidence of identity of the doctor's assailant as well as of intent and absence of accident or misfortune connected with inflicting the blow that proximately brought about the Quattelbaum death.

The general rule concerning admissibility of proof of other offenses and the exceptions are thus stated in *People* v. *Albertson,* 23 Cal.2d 550, 576 [145 P.2d 7] : "The general rule, universally recognized, is that in a criminal prosecution the defendant can be tried for no other offense than that which he is charged in the indictment or information; evidence of collateral independent crimes is not admissible. . . . The equally well recognized exceptions to this rule are clearly defined. Evidence of other crimes may be admitted when it tends directly to establish the crime charged by proving a material fact, where it is part of the res gestae, or where it helps to disclose motive, intent, premeditation, guilty knowledge, malice, or a common plan or scheme." The exceptions have now swallowed the rule as a practical matter. Witkin on California Evidence says, in section 136, page 158: "There is no fixed category of mutually exclusive exceptions; i.e., intent, common plan, identity, etc., are merely illustrative of the types of relevant facts in proof of which other crimes may be proved as circumstantial evidence. . . . And the cases illustrating the exceptions are so much more numerous than those applying the exclusionary rule that it has been suggested that the true rule could be more realistically stated in affirmative form: That evidence of other crimes is admissible whenever it is relevant to a material issue, and that it should be excluded only where its sole purpose and effect is

to show the defendant's bad moral character (disposition to commit crime). (See *People* v. *Peete* (1946), 28 Cal.2d 306, 314, 169 P.2d 924; *People* v. *McMonigle* (1947), 29 Cal.2d 730, 742, 177 P.2d 745; 13 So. Cal. L. Rev. 511; 22 So. Cal. L. Rev. 345.)'' Indeed, the proper approach to the problem seems to be an independent determination of relevancy and materiality rather than a search for exceptions to a so-called general rule. A case note in 13 Southern California Law Review, at page 513, says: ''It would be an almost endless task to attempt to reconcile the hundreds of decisions in point. Suffice it to say that the evidence admitted under one or another of the exceptions has not always appeared to fall properly within one of the established categories, the courts generally indicating a tendency to squeeze the evidence into an exception without indicating just how it fits and just what its relevancy is.

''So numerous and varied are the situations where evidence of other crimes has been admitted, that it has been observed, and an analysis of the cases reveals, that evidence of other criminal acts of defendant are universally excluded in only one situation and that is where the sole relevency of the offering is to show that the defendant is the particular kind of man that would be inclined to do the particular bad act for which he is on trial, or in other words, where the only relevancy of the evidence is to show the disposition of the defendant to commit the crime charged.''

McCormick on Evidence, section 157, pages 327-330: ''The rule is that the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is substantially relevant for some other purpose than to show a probability that he committed the crime on trial because he is a man of criminal character. There are numerous other purposes for which evidence of other criminal acts may be offered, and when so offered the rule of exclusion is simply inapplicable. Some of these purposes are listed below but warning must be given that the list is not complete, for the range of relevancy outside the ban is almost infinite; and further that the purposes are not mutually exclusive, for a particular line of proof may fall within several of them. Neither are they strictly co-ordinate. Some are phrased in terms of the immediate inferences sought to be drawn, such as plan or motive, others in terms of the ultimate fact, such as knowledge, intent, or identity which the prosecution seeks to establish. The list follows. . . . (5) To show, by similar acts or incidents, that

the act on trial was not inadvertent, accidental, unintentional or without guilty knowledge. (6) To establish motive. This in turn may be evidence of the identity of the doer of the crime on charge, or of deliberateness, malice, or a specific intent constituting an element of the crime. (7) To show, by immediate inference, malice, deliberation, ill-will or the specific intent required for a particular crime.''

The more recent view of the California Supreme Court is thus stated in *People* v. *McCaughan,* 49 Cal.2d 409, 421 [317 P.2d 974] : " 'It is settled in this state that except when it shows merely criminal disposition, evidence which tends logically and by reasonable inference to establish any fact material for the prosecution, or to overcome any material fact sought to be proved by the defense, is admissible although it may connect the accused with an offense not included in the charge.' (*People* v. *Woods,* 35 Cal.2d 504, 509 [218 P.2d 981].) In determining whether such evidence is relevant to prove a material fact and not just criminal disposition, the trial court should be guided by the rule that 'such proof is to be received with ''extreme caution,'' and if its connection with the crime charged is not clearly perceived, the doubt is to be resolved in favor of the accused, instead of suffering the minds of the jurors to be prejudiced by an independent fact, carrying with it no proper evidence of the particular guilt.' . . . If such evidence is determined to be relevant to prove a material fact in issue, it is for the trial court in the exercise of its judicial discretion to determine whether its probative value is outweighed by its possible prejudicial effect and to admit or exclude it accordingly, for ' [t]his is a situation where the policy of protecting a defendant from undue prejudice conflicts with the rule of logical relevance, and a proper determination as to which should prevail rests in the sound discretion of the trial court, and not merely on whether the evidence comes within certain categories. . . .' ''

Specific applications of this basic principle point definitely to the admissibility of the particular evidence now under discussion. In *People* v. *Harrison,* 46 Cal.App.2d 779, 786 [117 P.2d 19], a prosecution for commission of lewd and lascivious acts upon a child under the age of 14, the court said : ''When a defendant maintains that an act of which he stands accused is an innocent act, it is proper to call witnesses who can testify to prior attempts by the defendant to commit the same offense with which he stands charged or similar offenses. (*People* v. *Williams,* 6 Cal.2d 500 [58 P.2d 917].) In view of the fact that

the intent of the defendant was an important factor in the proof of his guilt, it was competent to show other indecencies of the appellant committed with respect to still another child in order to leave no doubt of the criminal quality of the act charged in the information."

*People* v. *Coltrin,* 5 Cal.2d 649, 656 [55 P.2d 1161] : "It is well settled that where an offense is of such a nature that proof of the act with which the defendant is charged is not in itself proof of the required criminal intent and where additional proof of such intent is necessary to prove the crime charged, evidence of other offenses of a similar nature committed by the defendant is admissible for the purpose of proving intent."

*People* v. *Clapp,* 67 Cal.App.2d 197, 201 [153 P.2d 758] : "Where a felonious intent is an essential ingredient of the crime and the accused claims that his act was accidentally, mistakenly or innocently done, or where the circumstances might support an inference that the act was lawful, it is proper practice to rebut such claim or inference by evidence of other criminal acts done by the accused, in which he used similar means and which produced the same result, in order to prove the criminal purpose that actuated the deed for which the prisoner is on trial. [Citations.] In such circumstances evidence of another crime is relevant if it logically tends to prove the intent of defendant in the offense under investigation although it might prove a distinct crime and prejudice the defendant before the jury. [Citation.] Such proof is especially permissible where the act charged is not in itself proof of the required criminal intent and other evidence of intent is necessary to complete the proof."

*People* v. *Williams,* 6 Cal.2d 500 [58 P.2d 917], presents a factual situation closely analogous to the one at bar. Defendant was on trial for larceny from the person. Officers on pickpocket detail in Grand Central Market testified they saw defendant remove a coin purse from the handbag of another woman. She denied stealing it and testified she stumbled over it and then picked it up from the floor. The officers also were permitted to testify that about 20 minutes before the Grand Central incident they followed defendant and saw her attempt the same kind of theft from another woman's handbag. The court upheld the ruling, saying at page 502: "It must appear to be obvious that evidence of similar conduct of the defendant, at least immediately prior to the commission of the offense charged, was relevant to rebut her testimony that she

stumbled upon the purse by accident. There may be room for argument that in the present case such evidence was merely cumulative in view of the testimony of the officers that the defendant was actually observed in the act of opening Mrs. Henig's pocketbook and taking the coin purse therefrom. But without more the jury may have been put to it to determine whether to believe the testimony of the officers · as to what their observations were with reference to the defendant's actions in taking the purse from Mrs. Henig's person, or to believe the defendant's testimony that she innocently stumbled over the purse and then picked it up from the floor. The evidence of her prior conduct was a distinct aid to the jury in the determination of the issue of intent.''

*People* v. *Sykes,* 44 Cal.2d 166, 170 [280 P.2d 769] : ''Generally, evidence to show a plan or scheme concerns the means used to gain an end, such as the theft of a pistol before an attack upon a person. Here, the district attorney used the ends to prove the means. It is not necessary to decide whether such evidence shows plan or scheme, because it was relevant to prove motive. The test for admissibility is : 'does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.' ''

The length of time elapsing between the crime charged and the others offered in evidence goes to the weight rather than the competency of the proffered proof. (*People* v. *Burns,* 109 Cal.App.2d 524, 538 [241 P.2d 308] ; *People* v. *Grimes,* 113 Cal.App.2d 365, 373 [248 P.2d 130].) In the instant case the elapsed time was so short as to be negligible.

We are convinced that the evidence under discussion was properly received for several purposes. As heretofore indicated defendant did not testify and the evidence of the crime was largely circumstantial. It left room for defendant to claim lack of identification, accident or absence of guilty intent, and by the same token it became competent for the prosecution to negative these probable claims through the evidence in question. It was also plainly proper as tending to prove lack of provocation for the assault on Dr. Quattelbaum and the making of same through the promptings of an abandoned and malignant heart,—the presence of the implied malice of Penal Code, section 188.

The intention inherent in this conviction is not intent to kill; it is the intent to commit an unlawful act the natural consequence of which is dangerous to human life, a felony (Pen. Code, § 245). Fricke on California Criminal Law, 7th edition, page 146: ''An unlawful killing in the perpetration or attempt to perpetrate a felony, other than the six felonies listed in the statutory definition of first degree murder, is murder of the second degree unless there also exists a specific wilful, deliberate and premeditated intent to kill in which event the murder would be of the first degree.'' Page 147: ''If the killing is done in the commission of an unlawful act intentionally performed, the natural consequences of which are dangerous to human life the crime is murder of the second degree. . . .'' The hand may be an instrumentality so used as to be dangerous to human life. *People* v. *Teixeira,* 136 Cal. App.2d 136, 150 [288 P.2d 535] : ''Normally, hitting a person with the hands or feet does not constitute murder in any degree. (*People* v. *Munn,* 65 Cal. 211 [3 P. 650] ; *People* v. *Kelley,* 208 Cal. 387 [281 P. 609] ; see anno. 22 A.L.R.2d 854.) But if death or great bodily harm is a reasonable or probable consequence of the beating the offense may be murder. (See anno. 24 A.L.R. 666.) Thus, to constitute murder there has to be either an intent to kill or such wanton and brutal use of the hands without provocation as to indicate that they would cause death or serious bodily injury so as to indicate an abandoned and malignant heart.'' (See also *People* v. *Martina,* 140 Cal.App.2d 17, 27 [294 P.2d 1015] ; *People* v. *Fuentes, infra,* 74 Cal.App.2d 737, 741 [169 P.2d 391].) Defendant's closed fist was shown to the jury and it is to be presumed in aid of the verdict that it appeared to be one capable of inflicting serious bodily injury.

 Appellant complains of the court's refusal of the following two instructions, viz.: ''Battery is an unlawful act not amounting to a felony. It is defined as any willful and unlawful use of force or violence upon the person of another. (242 P.C.). If you find from the evidence that the proximate cause of death was battery, then the crime committed may be involuntary manslaughter.'' ''Where a person in committing a battery without aggravating circumstances, unintentionally and proximately causes the death of the person assailed, the crime is manslaughter.'' The court endorsed the last quoted refused instruction: ''No lack of 'aggravating circumstances' in the evidence—sufficiently covered.'' This we find to be a fair appraisal.

Respondent concedes that these requests are correct *per se* but argues that the subject was adequately covered by instructions given, viz.: ''Manslaughter is the unlawful killing of a human being without malice. One kind of manslaughter, the definition of which is pertinent in this case, is involuntary manslaughter, being that which is done in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.''
''You are instructed that an unprovoked and unjustified assault with the fists may be a misdemeanor or a felony depending on the circumstances proven. If the evidence shows that such assault was by means of force likely to produce great bodily injury such assault would, itself, be a felony. In determining this question you may take into account the nature of the assault, the force used and the injuries, if any, inflicted. On the other hand, if the force used was such as not to be likely to produce great bodily injury then it would amount to no more than battery—a misdemeanor. You are further instructed that where one person commits a dangerous felony upon another whereby and as a proximate result of such felony the other dies, then the killing would be murder.'' Respondent's position is well taken for the instructions just quoted are comprehensive and correct. (See Fricke on California Criminal Law, 7th ed., p. 156.)

It is to be noted that ''In a prosecution for involuntary manslaughter the intent of the defendant is not material because the offense charged is the taking of life in certain unlawful ways without any intention of doing so. As was said in *People* v. *Miller,* 114 Cal.App. 293, 300, 301 [299 P. 742], '. . . the killing is involuntary manslaughter ''where death occurred, without malice or any intent to kill, but in the commission of an unlawful act not amounting to a felony.''' '' (*People* v. *Barnett,* 77 Cal.App.2d 299, 304 [175 P.2d 237].)

Complaint is made of instructions upon the subject of malice which were given by the court *sua sponte* during the trial. One[1] referred to attempted proof of an altercation

---

[1] ''THE COURT: No. The theory upon which this testimony might have been admissible, ladies and gentlemen, is that if the Defendant had attacked some other person that same night or within a reasonably short time previous, it might tend—you might be able to draw some evidence from that that the Defendant had what we call a malignant and abandoned heart if the attack was unprovoked. Now, in this instance we don't know whether it was unprovoked or not. The Court is sustaining the objection because the witness says that this young chap wised-off to him

between defendant and ''one kid'' between 8 and 9 o'clock of the evening of the assault upon decedent. It was given by way of explanation of a ruling sustaining defendant's objection and at defendant's request; it seems to have been satisfactory for his counsel thanked the court at its conclusion. Moreover, though somewhat involved in its expression, the instruction seems not to have been erroneous or misleading or prejudicial.

Another extemporaneous instruction,[2] given before the testimony of the two soldiers was received, is claimed to have implied that a murder had been committed and that it was done maliciously. The instruction is not fairly subject to this criticism.

 A third such instruction[3] tells the jury that testimony as to another assault would be received ''solely as it might indicate an abandoned and malignant heart.'' Certainly this was not prejudicially erroneous.

 Three instructions concerning an assault by means of force likely to produce great bodily injury (Pen. Code, § 245) are challenged as erroneous because inapplicable. Concededly an assault with hands or fists may fall in this category. Appellant argues that death from the rupture of a malformed

---

—the Court is going to presume what he meant by that—and that subsequently, why, the Defendant apparently did something which is not before any of us yet, but it would only be on the theory that the Defendant did something unprovoked, an unprovoked matter which the Court would believe to be admissible, and inasmuch as it has not been shown that what the Defendant may have done, if he did anything, was unprovoked, why, the Court is sustaining the objection. MR. CHOATE: Thank you.''

[2] ''THE COURT: It is immaterial. The objection will be sustained. I'm going to instruct the jury—I'm going to give you a little more instruction at this time, ladies and gentlemen, so you might better understand this case and the theory under which this testimony is admitted. . . . This defendant is charged with murder, which it has been stipulated is not first degree murder. It is not the death penalty murder. It is not through lying in wait and deliberation and contemplation, nor through poison and so forth. It could only be a second degree murder, and, as I have just stated to you, it must be malice. Malice is implied when no considerable provocation appears or when the circumstances attending the killing show an abandoned or malignant heart, so this testimony is to be received by you solely in connection with that contention of the prosecution.''

[3] ''THE COURT: Ladies and gentlemen of the jury, the Court admonishes you at this time that the testimony of this witness will be received by you solely as it might indicate an abandoned and malignant heart on the part of the Defendant. It is received for that purpose only, not to prove some other crime. We are only interested in this particular offense. It is received solely for the limited purpose as it may apply and assist you in deciding this particular offense and the matter to which the Court has related.''

blood vessel was not a foreseeable consequence of a blow with the fist and therefore the instructions should not have been given. But it was a question of fact whether a fracture of the skull or the bursting of a blood vessel from hypertension was the cause of death, and instructions to the jury on each theory were appropriate.

It is true, as we said in *People* v. *Mueller*, 147 Cal.App.2d 233, 238 [305 P.2d 178], that ''The gravamen of the crime defined by section 245 is *the likelihood that the force applied or attempted to be applied* will result in great bodily injury.'' But that presents a question of fact. At least it did so in this case. ■■ ■■ The following language of *People* v. *Fuentes*, 74 Cal.App.2d 737, 741 [169 P.2d 391], is pertinent: ''It is thoroughly settled in this state that an assault by means of 'force likely to produce great bodily injury' (Pen. Code, § 245) may be made by the use of the hands or fists (*People* v. *Bumbaugh*, 48 Cal.App.2d 791 [120 P.2d 703], and cases cited) and that what kind of an assault is likely to produce great bodily injury is generally a question of fact to be determined by the jury. (*People* v. *Nudo*, 38 Cal.App.2d 381 [101 P.2d 162].) . . . Under the facts of this case the measure of the likelihood of great bodily injury is the result produced by the blow and fall, for the likelihood of great bodily injury from the blow is demonstrated by the injury actually inflicted.'' Appellant's argument in support of this assignment of error cannot be sustained.

■■ It is argued that the cross-examination of prosecution witness Morrison was unduly and prejudicially restricted. That is the witness who exclaimed, ''There will be no damned fighting in here.'' She turned her attention elsewhere for a moment, then looked at Dr. Quattelbaum and defendant and saw the former sink to the floor. She did not see any blow struck. Appellant seeks to capitalize the following ruling: ''Q. On the night that you saw him when he came in, could you tell that he had been drinking? A. I think they had been. Q. Did you arrive at that conclusion from looking at Dr. Quattelbaum? MR. FELDMAN: I think at this time we are well beyond the scope of the direct examination. If counsel wishes to make this his own witness, it would be at the time of the rebuttal. THE COURT: That is true. That matter was not gone into on direct with this witness. MR. CHOATE: Part of all the circumstances surrounding the—— THE COURT: He only went into the portion as to what she saw with regard to the Defendant and the doctor. He didn't go into anything prior to that

at all. If you want to make her your witness, you may for that purpose. MR. CHOATE: No. She is the People's witness and I shan't make her my own witness.'' The ruling was erroneous for the question went to the matter of intoxication of the doctor and hence the cause of death. It certainly was within the scope of the direct examination and the judge applied too narrow a conception of cross-examination. But the ruling was not prejudicial, especially in view of the later proof that the doctor had .16 per cent of alcohol in his blood.

We find no prejudicial error, no miscarriage of justice in this case.

The judgment and the order denying motion for new trial are affirmed.

Fox, P. J., and McMurray, J. pro. tem.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 4, 1961.

*Assigned by Chairman of Judicial Council.