[Crim. No. 3921. Second Dist., Div. Three. Jan. 18, 1946.]

THE PEOPLE, Respondent, v. EVELYN MILLER, Appellant.

Crispus A. Wright for Appellant.

Robert W. Kenny, Attorney General, and Howard S. Goldin, Deputy Attorney General, for Respondent.

DESMOND, P. J.—Defendant, in a jury-waived trial, was found guilty upon two counts charging her with committing an assault with caustic chemicals, as defined in section 244, Penal Code, upon two soldiers who called at her house at about 2 o'clock a. m. on December 13, 1944. She appeals from both judgments on the ground of insufficiency of the evidence to support the convictions. We shall, therefore, summarize the evidence which, in our opinion, amply supports the convictions.

It appears without dispute that the two soldiers, under the influence of liquor, traveled in a taxicab from downtown

Los Angeles to the home of the defendant in the southerly part of the city. They went onto the porch of the appellant's house, rang the doorbell and knocked upon the door. After a few minutes a woman's voice, coming from the inside of the house, said: "Go away or I will shoot you. . . ." One of the soldiers, in his testimony, identified the voice as belonging to the defendant and testified that instead of going away they continued to knock upon the door for several minutes, rang the bell, but denied having kicked the door. They stated that they turned the knob of the door but did not try to force it open. The taxi-driver testified that he saw the soldiers enter the porch and heard them knock vigorously, one of them saying, "in a pleading, persuading tone of voice, 'That is all right, Honey, we have got lots of money, and you can take both of us. Come on, Baby, let us in. We were here and drank beer before.' "

According to the appellant, after her door bell rang she looked out and saw the soldiers staggering around and recognized them as two men who had been there three days previously. She turned on the porch light and asked what they wanted and they said they wanted to see "Maxie" or "Maisie." She informed them that no one by that name lived there, told them to go away, and then turned off the light. The soldiers, however, remained upon the porch, ringing the doorbell, pounding upon the door and, finally, according to appellant, one of them said: " 'Let's go in; she is in there by herself, and we have been here too long, and nobody has seen us and nobody will know we are going in.' " One of the soldiers, according to appellant, then said: " 'If you shoot us, you will hang before sun up.' " She further testified that when one of the soldiers kicked the lock, she went into the bathroom where she found a wash basin containing water, soap powder and Purex, as well as a can containing lye. She testified: "I happened to think about this lye, and I took it out and the little can of lye was about three-fourths full and I only put about one-fourth in the pan of water, and then I went to the door." By this time, appellant continued, the noise had stopped and she thought the soldiers had gone, but when she turned on the porch lights someone exclaimed, " 'She is there, and we are going to get in' "; that she immediately opened the door, hurled the solution at the soldiers, quickly closed the door and turned off the light. After the soldiers ran out to the street calling "Taxi," appellant returned to bed.

The taxi driver testified that he saw "something like a flash" on the porch and saw one of the soldiers staggering down the steps; that the other soldier then grabbed him by the arm, brought him toward the cab and shouted, " 'Cabby, get a doctor, or get us to the hospital.' " Upon being asked about the condition of the soldier who was grabbed by the arm and led toward the cab, he said, "He was screaming at the top of his voice, as though he was insane, and was hollering, 'What is the matter with you? Can't you drive this car? Why don't you get going?' " The taxi driver testified that he stopped at a hotel displaying a neon sigh and that it was the first place that looked as though it were open; that he and his two passengers went upstairs and in the men's lavatory; that the soldiers undertook to wash their faces; that one of them "had a very slick look and his lips were puffed up and all swollen looking." From the hotel they then went to the Georgia Street Receiving Hospital where the taxi driver saw one of the soldiers placed upon the table and, upon his eyelids being rolled back, saw that the "eyeballs were black or a kind of slate color." He also noticed that the other soldier had a burned spot on his neck.

Two police officers, who were in the receiving hospital when the soldiers were admitted, were directed to investigate their case. One of them, being called to the witness stand, testified that: "The faces of both of them were burned. They were flushed and pitted with black marks from the solution that was on their faces. Q. What did you notice particularly as to ———'s [naming one of the soldiers] condition? A. His eyes were closed, and while the doctor was treating them, I took hold of the eyelid and raised it so I could see the right eyeball, and at that time it resembled a hardboiled egg with the shell taken off. It was completely white and seared. . . . The other eye was damaged slightly on the extreme left side. . . . The lids were swollen and red. . . . His mouth was swollen and there were spots that were all black where he had received severe burns." The two officers then went out to the house where the soldiers had been refused admittance. According to one of these officers, the defendant stated that she had tried to get the soldiers to go away; that they would not go; that she went and got this solution, fixed it up, brought it to the door and threw it at them to get rid of them. The appellant, upon being asked by the officers whether she knew that the solution would harm the parties, answered, " 'Sure,

that is what I wanted to do.'" He stated also that "We asked her why she took such severe measures when she had ample help in the house. There were seven other people besides herself." Among these, according to the officers, were two colored men, each of whom they found in bed with a woman. The appellant, however, said, "she did not want to bother anybody else." Upon being taken to the police station, the defendant made and signed a written statement, which is reproduced in the record and from which it appears that she threw the caustic solution upon the soldiers, saying "I was afraid; I didn't know what they were going to do. So that was the only way I knew how to get them out quick, I was afraid." She stated that two men were in her house at the time. Being asked why she did not call them to her assistance, she replied, "Because they were using such nasty language. I figured in that case a woman could handle it better than a man. Usually civilian men and soldiers don't get along, particularly when they are of a different color." Upon being asked whether she knew that the caustic solution would probably produce serious injuries, she answered, "No, it never had hurt me. I use it practically every day, getting grease off the floor and so on," and further stated that she used the lye because "I knew that would make them leave. Because it gives them the itch and they would scratch and would look for something. I knew they would go away." She also stated that she had seen one of the soldiers about three days prior to December 13, at which time he and another soldier had come to her home at about 5:30 in the morning and that on that occasion "I bluffed them away. I told them I was going to shoot them and one said 'let's go' and the other he said he didn't know whether he ought to go or not, that must have been the tall one as this one (pointing . . .) came off the steps and started around towards the front."

The soldier just indicated was called in rebuttal and testified that he had been at appellant's house on three occasions. The first of these was on the morning of December 2d, when he was alone, and observed a woman named "May" in the company of a sailor. As to the two other occasions, he testified as follows: "Q. Did you at any time go to a back window and try to get in or pull the screen off of the window three days before that time? A. On the morning of the 9th, Sunday morning, I and another fellow . . . went out there and I went out there because I remembered the place. I did not

do anything at first. We went out there and knocked on the door and nobody answered. We asked for Maisie and did not get any answer. Somebody told us to get away or they would shoot us, so I said, 'Let's go,' and this other fellow that was with me, he was very tall, as she described him, and then we went away. Q. Did either of you go to the back? A. Yes, he wanted to go around to the back, and I went with him and knocked on the screen door, but we did not tear it off. Q. Did either of you attempt to pull it off? A. No. Q. Did you on the morning of December the 13th kick or hit the lock or the door and try to open it or not? A. We turned the knob, but we did not try to force it. Q. Did you at any time make any statement that you aimed to get in whether they liked it or not? A. Not that I recall.''

The People concede that the soldiers who went upon appellant's porch on December 13th were trespassers and that they were given notice to get off the premises; they also concede that the owner of property has the right to use necessary force to prevent a forcible trespass, but contend that in this case it was not necessary for appellant, in order to rid her premises of the presence of the soldiers, to resort to the force which she employed. They rely upon the principle stated in the recent case of *People* v. *Corlett* (1944), 67 Cal.App.2d 33, at page 51 [153 P.2d 595, 964], namely: ''that the owner of property is justified in using force or a deadly weapon to eject a trespasser only *when it is manifest to one, as a reasonable person,* that injury to the property is contemplated, and that the owner is then entitled to use only such force as is *reasonably necessary* to justify the attack or to protect the property.'' See, also, *People* v. *Teixeira* (1899), 123 Cal. 297 [55 P. 988], where the court, speaking of the defendant, said (p. 299) : ''In law he was only entitled to use that amount of force necessary for the protection of his property.'' In *People* v. *Hubbard* (1923), 64 Cal.App. 27 [220 P. 315], this appears (p. 35) : ''The person who is acting in defense of his habitation must first use moderate means before resorting to extreme measures. But he may resist force with force, increasing it in the ratio of the intruder's resistance, without measuring it in golden scales; and whether he has used excessive force or not is a question for the jury. 'The question of the amount of force justified in repelling an assault *or maintaining the possession of property* (italics ours) is one peculiarly within the province of the jury.' (*Fawkes* v. *Reynolds*, 190 Cal. 204 [211 P. 449].)''

In the instant case there was no jury and the trial judge was called upon to determine whether excessive force was used by the appellant. He knew that when the soldiers asked to be admitted there were at least seven persons, other than appellant, in her house, two of them being men, and that their presence would have been some guarantee of appellant's safety even if entry had been effected. He was in a position, from the evidence before him, to determine what kind of an establishment appellant maintained and to conclude that she was not so much afraid of any injury to herself or her property as she was anxious to get rid of her callers who were unwelcome at that particular time. It is apparent that they were making nuisances of themselves, but we cannot say that the trier of the facts erred when he concluded that the appellant used excessive force when she opened the door of her house and threw the caustic liquid in the faces of the soldiers.

The judgments are affirmed.

Shinn, J., and Wood, J., concurred.