[Crim. No. 9930.   Second Dist., Div. Two.   Apr. 5, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. CLIFFORD JUDSON HUSS et al., Defendants and Appellants.

Thomas W. LeSage and A. L. Wirin, under appointment by the District Court of Appeal, for Defendants and Appellants.

Fred Okrand as Amici Curiae on behalf of Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

FLEMING, J.—Five members of the American Nazi Party, wearing party uniforms, steel helmets, and swastika armbands, picketed a meeting held to celebrate the fifteenth anniversary of the independence of Israel. Public disorder resulted, and all five were arrested, convicted, and sentenced on charges of conspiracy and assault. Three defendants have appealed.

The anniversary meeting was scheduled for 8:30 p.m. in the Shrine Auditorium. At 7:30 that evening defendant Holstein notified the police that he and four other members of the American Nazi Party intended to picket the meeting at 8 o'clock. When defendants arrived on the scene, the doors of the Shrine on Royal Avenue had not been opened, and a large crowd had gathered on the sidewalk outside the auditorium. The crowd extended along the sidewalk of Royal to Jefferson Boulevard, the street bounding the auditorium on the south. Two traffic officers were funneling pedestrians onto the corner of Royal and Jefferson, and two plainclothes officers assigned to interview the pickets were standing at the curb outside the entrances to the auditorium.

Defendants parked their automobile on Jefferson near Royal and walked to the corner in a loose line, carrying signs which read: "American Nazi Party", "Zionism is Treason", "85% of the Atom Spies were Racial Jews", "Communism is Jewish", " 'Some call it Marxism, I call it Judaism,' quote Rabbi Steven S. Wise", "Citizens Read Protocols of the Learned

Elders of Zion'', ''Sig Heil, UAR'', ''Keep America White.'' At the corner defendants got into picket formation and marched north on Royal for approximately 65 feet. They then reversed direction, returned to the corner, and reversed direction again. Numerous witnesses testified the defendants were pushing and shoving their way through the crowd, although defendants denied this and the plainclothes officers assigned to interview them watched without taking action. On defendants' third pass through the crowd, fighting broke out at both ends of the picket line, and general disorder ensued. All five pickets were arrested and charged with the felony of conspiracy to assault and to riot. (Pen. Code, § 182, subd. 1.) Four of them were also charged with specific felonious assaults on individual police officers and civilians.

Krauss, the picket leader, was convicted of conspiracy and of two assaults on uniformed police officers by means likely to produce great bodily injury. (Pen. Code, § 245, subd. (b).) He was sentenced to state prison and has not appealed.

Holstein, second in the picket line, was convicted of conspiracy and of simple assault on William Mazzoni, a plainclothes officer. (Pen. Code, § 240.) Mazzoni was attempting to subdue another defendant when Holstein struck him in the jaw with his fist. Holstein was sentenced to a term in the county jail.

Huss, third man in line, was convicted of conspiracy, two assaults by means of force likely to produce great bodily injury (Pen. Code, § 245), and simple assault on Mazzoni, the plainclothes officer (Pen. Code, § 240). Huss struck Theda Moss with the pole supporting his sign and broke her wrist; he struck Stuart Klein repeatedly with his pole, inflicting a head wound which required several stitches. Officer Mazzoni was trying to stop Huss from striking Klein when Huss turned and hit him. Huss was sentenced to state prison.

Reeves, the fourth picket, was convicted of conspiracy only (Pen. Code, § 182, subd. 1). He was sentenced to state prison.

McLaughlin, the fifth picket, was convicted of conspiracy, assault by means of force likely to produce great bodily injury (Pen. Code, § 245), and simple assault (Pen. Code, § 240). McLaughlin had struck Leon Hekier, a civilian, with his picket pole. At the time of his arrest McLaughlin also hit Thomas Gould, a plainclothes officer, in the mouth with his fist. McLaughlin was sentenced to state prison, and his appeal has been dismissed for failure to prosecute.

The conspiracy count, on which all defendants were convicted, charged a criminal agreement among them to go to the Shrine to commit the crimes of forcible assault, forcible assault on a police officer, assault, battery, and riot. Evidence relied upon by the prosecution to support the conspiracy charge included the use by the defendants of signs, slogans, and symbols known to and intended to provoke, incite, agitate, and inflame those in attendance at the celebration. Defendants argue that the court's instructions on this aspect of the case misled the jury and infringed their right of free speech guaranteed by the First and Fourteenth Amendments to the United States Constitution.

Count I in its relevant aspects charged a *conspiracy to riot*. The instructions defined riot to include the "use of force or violence, *disturbing the public peace, . . .*" (Italics added.) Disturbing the public peace was defined thus: "*Disturbance of the peace* and breach of the peace are synonymous. It includes all violations of the public peace or order, or decorum; in other words, it signifies the offense of disturbing the public peace or tranquility enjoyed by the citizens of a community; a disturbance of the public tranquility by *any act* or conduct inciting to violence or *tending to provoke or incite others to break the peace*; a disturbance of public order by any act of violence or by *any act* likely to produce violence or *which by causing consternation and alarm, disturbs the peace and quiet of the community*." (Italics added.)

The court refused the defendants' requested instruction that words of abuse or insult do not justify forcible assault and that one so assaulted may defend himself against the assault.

Defendants argue that the instructions defined disturbing the peace to include acts tending to provoke others to disturb the peace, and that consequently the jury was given the erroneous impression that it could consider defendants' use of provocative slogans, symbols, and costumes as evidence of a conspiracy to riot. They contend the instructions suggested to the jury it could find defendants guilty of conspiracy to riot if defendants knew their signs would tend to arouse and inflame those at the Shrine—an error compounded by the court's failure to instruct the jury that words of abuse do not justify forcible assault and that one so assaulted may defend himself.

Defendants rely on the case of *Terminiello* v. *Chicago*, 337 U.S. 1 [69 S.Ct. 894, 93 L.Ed. 1131]. Terminiello was convicted of disorderly conduct after speaking in an auditorium under

the auspices of the Christian Veterans of America. Outside the auditorium an angry and turbulent crowd gathered to protest the meeting. The crowd hurled rocks through the windows, broke down doors, and threatened to get beyond police control while Terminiello vigorously condemned them. Terminiello's speech, including his anti-Jewish epithets, provoked the audience to expressions of immediate anger, unrest, and alarm. The trial court instructed the jury it might find Terminiello guilty of inducing a breach of the peace if his behavior stirred the public to anger, invited dispute, brought about a condition of unrest, created a disturbance, or molested the inhabitants in the enjoyment of peace and quiet by arousing alarm.

Terminiello's conviction was held to violate the constitutional guarantee of free speech. "The ordinance as construed by the trial court seriously invaded this province. It permitted conviction of petitioner if his speech stirred people to anger, invited public dispute, or brought about a condition of unrest. A conviction resting on any of those grounds may not stand." (337 U.S. at p. 5.)

The prosecution challenges the applicability of *Terminiello* and in its brief squarely poses the legal issue between the parties to this case thus: "There emerges from this position [of defendants] the following legal proposition: That these five pickets had a constitutional right to dress in Nazi uniforms with helmets and swastika armbands, to go to the Shrine Auditorium carrying placards saying, 'Zionism is Treason', [etc.]; to march into a dense crowd they knew to be mostly Jewish, attending a celebration of the 15th Anniversary of Israel, and that the pickets had a right to do this regardless of the fact that it would inflame the crowd to violence. We are unable to agree that this is the law."

The prosecution goes on to argue that this activity of the defendants "was a highly insulting and aggressive act that does not permit [them] to claim that when the expectable violence occurred they were merely acting in self-defense."

█ Nonetheless, we think the existence of a constitutional right to speak, demonstrate, and picket on behalf of causes known to be highly offensive to those picketed was settled in *Terminiello*, where the court upheld such a right in sweeping terms and ruled that under the First Amendment it cannot be made an offense "merely to invite dispute, or to bring about a condition of unrest." (337 U.S. at p. 6.)

On provoking others the Supreme Court in *Terminiello* had this to say: "[A] function of free speech under our system of

government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, *Chaplinsky* v. *New Hampshire,* pp. 571-572 [315 U.S. 568 (62 S.Ct. 766, 86 L.Ed. 1031)], is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of serious substantive evil that rises far above public inconvenience, annoyance, or unrest. See *Bridges* v. *California,* 314 U.S. 252, 262 [62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346]; *Craig* v. *Harney,* 331 U.S. 367, 373 [67 S.Ct. 1249, 91 L.Ed. 1546]. There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas, either by legislatures, courts, or dominant political or community groups.'' (337 U.S. at pp. 4-5.)

Implicit in this view is the idea that free speech is a positive good, a constructive and dynamic element in our society which by its astringent quality scours rusty ideas and tests familiar conceptions to see whether they still hold water. Recent cases in the Supreme Court dealing with free speech have generally involved agitation on the side of the angels—attempts to broaden civil rights and to secure equal treatment for different races. (*Edwards* v. *South Carolina,* 372 U.S. 229 [83 S.Ct. 680, 9 L.Ed.2d 697]; *Cox* v. *Louisiana,* 379 U.S. 536, 552 [85 S.Ct. 453, 13 L.Ed.2d 471].) Currently we tend to equate free speech with nobility of purpose, selfless idealism, humanitarian activity, and progress toward the betterment of man. The present case does not fit our accustomed pattern, for it takes an active imagination to discover any elevated or positive good in the provocative activities of the defendants—or indeed any real motive for their conduct other than mischief-making and quarrelsomeness. For this reason it is difficult to appreciate the connection between the elevated sentiments of the Supreme Court, traditionally associated with the laudable aspects of free speech, and defendants' picketing at the Shrine.

We can perhaps acquire a more appropriate view of the relevancy of the First Amendment to this case if instead of thinking of free speech as a positive good—which it may or may not be in a given instance*—we look on speech as a tool

*Cf. Iago and Othello.

that is neutral, good or bad according to its use, and consider what restraints on bad speech are justifiable and feasible. When we look at speech with this in mind we immediately face two formidable difficulties inherent in the problem of restricting bad speech. One difficulty is that of boundaries—how determine what advocacy is permissible dissent and what is pernicious mischief beyond the pale. Is it beyond the bounds of propriety to advocate that Zionism is treason? To advocate black supremacy? Victory for the Viet Cong? Dictatorship of the proletariat? Communism? Anarchism? Civil disobedience? Filthy speech? Narcotics for teenagers? Sexual promiscuity for grammar students? In an attempt to suppress subversive, pernicious, and antisocial doctrines inevitably we find ourselves enmeshed in the task of establishing the boundaries for orthodox thought and drawing the line between the thinkable and the unthinkable.

The second difficulty is that of censors. Who is to make the determination? Courts? Juries? Legislators? Police? Prevailing public opinion? Who has the final say when censors disagree? Here again the problems proliferate.

Because of the difficulties in defining orthodoxy and determining who shall define it, it has always seemed preferable in the normal operation of our democratic society to put up with a considerable amount of bad speech in public places from demagogues and psychopaths rather than undertake to regulate the content of speech and determine which slogans and doctrines will be allowed the freedom of the market place. Speech is free under the First Amendment, not so much because free speech is inherently good as because its suppression is inherently bad. In the American garden we let a hundred flowers bloom, knowing that among them may be skunkweed and thistle, dandelion and poison oak. For us excess of speech involves a lesser evil than does restriction on its exercise. In our Eden, Satan and the Archangel Gabriel may both be heard.

The *Terminiello* case has been consistently followed by the United States Supreme Court since its rendition in 1949. (*Edwards* v. *South Carolina,* 372 U.S. 229. 237-238 [83 S.Ct. 680, 9 L.Ed.2d 697] ; *Cox* v. *Louisiana,* 379 U.S. 536, 551-552 [85 S.Ct. 453, 13 L.Ed.2d 471] ; *Kunz* v. *New York,* 340 U.S. 290 [71 S.Ct. 312, 328, 95 L.Ed. 267, 280].) California does not recognize the doctrine that fighting words or insulting language justify an assault (*People* v. *Mueller,* 147 Cal.App. 2d 233, 240 [305 P.2d 178] ; *Vaughn* v. *Jonas,* 31 Cal.2d 586

[191 P.2d 432]), nor has it attempted to legislate against their use. Hence the question does not arise whether a suitable and narrowly-drawn statute could authorize the police to arrest pickets who display insulting and offensive signs. (*Chaplinsky* v. *New Hampshire,* 315 U.S. 568 [62 S.Ct. 766, 86 L.Ed. 1031] ; *Beauharnais* v. *Illinois,* 343 U.S. 250 [72 S.Ct. 725, 96 L.Ed. 919].)

We conclude that here, as in *Terminiello,* the instructions unconstitutionally invaded the domain of free speech by suggesting to the jury it could infer a conspiracy to riot from defendants' display of provocative signs and slogans which might incite others to break the peace. The jury was not told that those picketed had no right to break the peace or resort to violence because of antipathy towards defendants' signs, slogans, symbols, and costumes, but rather the jury was advised that acts of the defendants which tended to incite others to break the peace could be construed as evidence of their conspiracy to riot.

The prosecution argues that on the facts of this case the jury could have found the defendants guilty on legitimate grounds encompassed in the instructions and could have inferred the existence of a conspiracy to assault and riot, not by reason of the party slogans and symbols which were used, but by other evidence in the case, such as the use of steel helmets, the purchase of poles suitable for use as clubs, and the defendants' pushing and shoving in the crowd outside the auditorium. This same argument was made in *Stromberg* v. *California,* 283 U.S. 359 [51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484], where the trial court instructed the jury it could find the defendant guilty if she did an act for any one of three purposes, of which one was constitutionally protected. The California District Court of Appeal sustained the conviction, holding that despite the fact that one of the purposes charged could not constitutionally be punished, the other two could. The United States Supreme Court reversed: "We are unable to agree with this disposition of the case. The verdict against the appellant was a general one. It did not specify the ground upon which it rested. As there were three purposes set forth in the statute, and the jury was instructed that their verdict might be given with respect to any one of them, independently considered, it is impossible to say under which clause of the statute the conviction was obtained. . . . if any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld." (Pp. 367-368.) The

Supreme Court in *Terminiello* followed this rule, saying, "As construed and applied it at least contains parts that are unconstitutional. The verdict was a general one; and we do not know on this record but what it may rest on the invalid clauses." 337 U.S. at p. 5; cf. *Shuttlesworth* v. *Birmingham,* 382 U.S. 87, 92 [86 S.Ct. 211, 15 L.Ed.2d 176].) The same principle applies to the case at bench, and the conviction for conspiracy must be reversed.

█ Although we reverse the conviction for conspiracy, a charge premised on the defendants' advance intentions to assault and to riot, we find no infirmity, constitutional or otherwise, in the convictions of the defendants for the assaults which they committed after they arrived on the scene and the disorder had started. There was substantial evidence to show that at that time these defendants indulged in an excess of violence for which there was no sufficient legal excuse. (*People* v. *Young,* 136 Cal.App. 699, 703 [29 P.2d 440]; *People* v. *Miller,* 72 Cal.App.2d 602, 606 [165 P.2d 30]; *People* v. *Moody,* 62 Cal.App.2d 18, 22-23 [143 P.2d 978]; *McLean* v. *Colf,* 179 Cal. 237 [176 P. 169].)

█ The right of free speech on behalf of unpopular causes does not carry with it a license to make the streets ideological battlegrounds, to indulge in demonstrations based on strong-arm techniques, or to deny others the use of the streets for normal movement and passage. Free speech is not an absolute right but one subject to specified limitations. (*Konigsberg* v. *State Bar of California,* 366 U.S. 36, 49 ff. [81 S.Ct. 997, 6 L.Ed.2d 105], and cases there cited.) █ Use of the streets for picketing or demonstration involves not only questions of free speech but also questions of domestic tranquility. Picketing, though used to communicate ideas, is not speech, and therefore by itself not protected under the First Amendment. (*Hughes* v. *Superior Court,* 339 U.S. 460, 464-466 [70 S.Ct. 718, 94 L.Ed. 985]; *Giboney* v. *Empire Storage & Ice Co.,* 336 U.S. 490 [69 S.Ct. 684, 93 L.Ed. 834]; *Cox* v. *Louisiana,* 379 U.S. 559, 578 [85 S.Ct. 466, 13 L.Ed.2d 487] [Black, J., concurring and dissenting].) █ The time, manner, and place for the expression of ideas in the streets, whether by speaking, demonstrating, or picketing, are subject to regulation and control by the police in the process of maintaining public order. (*Cox* v. *New Hampshire,* 312 U.S. 569, 574 [61 S.Ct. 762, 85 L.Ed. 1049, 133 A.L.R. 1396]; *Cox* v. *Louisiana,* 379 U.S. 536, 554-555 [85 S.Ct. 453, 13 L.Ed.2d 471]; *Cox* v. *Louisiana,* 379 U.S. 559, 574 [85 S.Ct. 466, 13 L.Ed.2d 487].) █ Assaults committed in the course of picketing or

of public demonstrations may, as here, be promptly and severely punished under the provisions of the Penal Code. (*United Auto. Workers* v. *Wisconsin Employment Relations Board,* 351 U.S. 266 [76 S.Ct. 794, 100 L.Ed. 1162]; *Steiner* v. *Long Beach Local No. 128,* 19 Cal.2d 676, 682 [123 P.2d 20].)

Defendants contend a reversal of their conviction on the conspiracy count entitles them to a new trial on the assault counts because the error on the one count necessarily prejudiced the fairness of their trial on the others. We do not agree. Each assault count was fully supported by the testimony of third-party police officers and the victim. We do not think the erroneous instructions on conspiracy produced a miscarriage of justice on the assault counts or that a different result on retrial is reasonably probable. (Cal. Const., art. VI, § 4½; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

The convictions for conspiracy under Count I are reversed. The convictions for assault under Counts IV, V, VI, and VII are affirmed.

Herndon, J., concurred.

ROTH, P. J., Concurring and Dissenting.—I concur with the majority in an affirmance of the judgment as to Counts IV, V, VI and VII.

I dissent from the judgment reversing the conviction of defendants for conspiracy under Count I.

My colleagues reverse the judgment of conviction under Count I on a very narrow point.

Count I of the information did not charge conspiracy to breach the peace. It charged ''Conspiracy to commit assault by means of force likely to produce great bodily injury, assault, battery, and riot . . .'' It set forth 13 overt acts.

Nothing in Count I says anything about disturbing the peace *per se.*

The trial court in its instructions to the jury gave the code definition of riot as follows: ''*Any use of force or violence, disturbing the public peace, or any threat to use such force or violence, if accompanied by immediate power of execution by two or more persons acting together and without authority of law, is a riot.*'' (Pen. Code, § 404.) (Italics added.)

The court then followed with the instruction criticized by defendants and found fatally defective in this court by the majority re disturbance of the peace. This instruction merely

amplified the instruction on riot. It did not eliminate that portion of the riot instruction which required ''force and violence'' or ''threats to use force and violence.'' As pointed out hereafter, this instruction did not stand alone. The charge to the jury read as a whole could leave no doubt that physical force or the threat thereof was necessary to convict.

In addition, as pointed out by the majority, the court did refuse to give the defendants' requested instruction number 11, to the effect that ''. . . words of abuse or insult do not justify forceable assault and that one so assaulted may defend himself . . . .''

Criticizing the court's instruction set out by the majority in respect of disturbance of the peace, defendants, quoting *Terminiello*, argue, '' '[The instruction] permitted conviction of petitioner if his speech stirred people to anger, invited public dispute, or brought about a condition of unrest. A conviction resting on any of these grounds may not stand.' ''

In *Terminiello*, the only charge on which defendant was tried was disturbing the peace. No other instructions given cured the defective instruction.

Construing *Terminiello*, defendants argue: ''In other words, in the case at bar, where emotions admittedly became aroused, it was especially important that the principles of free speech be made crystal clear and the jury have been advised thereof so as to make sure that the defendants, if they were to be convicted, have been convicted only for *their illegal* acts and not because their speech aroused antagonism in *others* who resorted to violence.''

Instruction number 11 which defendants requested, and which was refused by the court, is verbatim as follows:

''No words of abuse, insult or reproach addressed to a person or persons or uttered concerning him or them, howsoever opprobrious the words may be, if unaccompanied by any threat or apparent threat of great bodily injury or any assault upon the person, will justify the person or persons in an assault by any means of force likely to produce great bodily injury, and a person so assaulted may defend himself against such assault according to the rules governing self-defense upon which I (have) (will) instruct(ed) you.''

The majority opinion omits to mention, however, that the court did give at the People's request, the following instruction (CALJIC 606):

''No words of abuse, insult or reproach addressed to a person or uttered concerning him, howsoever grievous or opprobrious the words may be, [if unaccompanied by any

threat of great bodily injury or any assault upon the person or any trespass against lands or goods,] will justify him in an assault with a deadly weapon [or] by any means of force likely to produce great bodily injury, and the provocation only of such words will not constitute a defense to a charge of having committed such an assault.''

Defendants concede that the court properly gave People's instruction CALJIC 606, but they nevertheless contend that there is a prejudicial variance between the two. They argue that: ''The failure to give defendants requested instruction number 11 and the giving of CALJIC 606, resulted in twisting the matter completely about. Rather than there being an instruction telling the jury what the *crowd* was not permitted to do against defendants if they, the crowd, took umbrage at defendants' signs, the jury was told what *defendants* could not do if they, the defendants, took umbrage at what the crowd was saying. And the jury was told, of defendants' discomfiture with the remarks of the crowd, that 'the provocation only of such words will not constitute a defense to a charge of having committed such an assault.' The only persons before the Court charged with such an offense were the defendants.

''In other words, the giving of the *Terminiello* type of instruction (allowing conviction of defendants' signs disturbed the tranquility of the crowd or caused it consternation or alarm) together with the refusal to instruct that the crowd had no right to assault defendants because of their disapproval of the contents of the signs, coupled with the giving of the instruction that defendants had no right to assault the members of the crowd because of defendants' disapproval of what the crowd said, permitted a conviction of defendants for the exercise of their constitutional right to free speech because *others* engaged in violence.''

Defendants argue further in respect of the variance ''. . . [I]t was absolutely essential, if the defendants were to be given a fair trial and if the right to the exercise of free speech were to have any meaning in it, that the jury be instructed they were not permitted to convict defendants because the crowd's tranquility was disturbed by defendants' signs or because the signs caused the crowd consternation or alarm. Not only were the jury not instructed that they could not convict defendants if they thus found, but they were, . . . affirmatively advised that they could convict if the signs did disturb the crowd's tranquility or caused it consternation or alarm.''

The distinction defendants insist upon between requested instruction number 11 (refused) and CALJIC 606 (given), if standing alone may have misled a jury, but when read with other instructions requested by defendants and given by the court, there is no doubt that the jury understood that defendants could not be convicted for peacefully carrying signs, however provocative. In *Terminiello* and the other cases quoted, there were no such additional instructions.

A reading of the complete charge shows that the jury was instructed on every theory of the defense and emphatically instructed on the point that defendants could not be convicted merely because they carried signs, however explosive and provocative.

The trial court, at defendants' request, instructed in part as follows:

"Peaceful picketing is recognized as a proper exercise of freedom of speech protected by the Constitution of the State of California and of the United States."

"The principle of freedom of speech, in and of itself, is not a defense to the commission of the crimes of assault, battery, riot, or a conspiracy to commit any of these crimes."

"A picket may be peaceful even though he loiters, walks, stands, or sits upon a public highway, alley, sidewalk, or crosswalk, and thereby constitutes to some extent an obstruction to the free passage of persons or an annoyance to persons who do not approve of his presence."

"The fact that to some extent compulsion, coercion, intimidation, or threats are employed in picketing does not detract from its peaceful nature so long as they constitute only economic, moral, or social pressure and not the pressure of violence."

"Resistance sufficient to prevent the offense may be made by a party about to be injured to prevent an illegal attempt by force to take or injure property in his lawful possession."

In addition, the trial court at the request of the prosecution, gave instructions as follows:

"It is lawful for a person who is being assaulted, and who has reasonable ground for believing that bodily injury is about to be inflicted upon him, to stand his ground and defend himself from such attack, and in doing so he may use all force and means which he believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent."

"A person who has been attacked and who is exercising his right of lawful self-defense is not required to retreat, and he not only may stand his ground and defend himself against the attack but may also pursue his assailant until he has secured himself from danger if that course appears to him, and would appear to a reasonable person in the same situation, to be reasonably and apparently necessary; and this is his right even though he might more easily have gained safety by withdrawing from the scene."

In short, the court in my opinion, did not, as defendants contend and the majority state, suggest: ". . . to the jury it could infer a conspiracy to riot from defendants' display of provocative signs and slogans which might incite others to break the peace. . . ."

To the contrary, the jury was told, as the majority insist it should have been ". . . that those picketed had no right to break the peace or resort to violence because of antipathy toward defendants' signs. slogans, symbols, and costumes. . . ." Nor, in my opinion, do the instructions, when read together as they must be, form any basis for the statement of the majority that ". . . the jury was advised that the acts of the defendants which tended to incite others to break the peace could be construed as evidence of their conspiracy to riot."

There can be no true liberty without free speech. This does not mean that when speech is accompanied by numerous acts of physical provocation, of which there is abundant evidence which is only sketchily detailed by the majority, that free speech should be permitted to become the refuge of violent scoundrels by reason of a single instruction which is incorrect only when it stands alone.

Assuming, that the failure to give instruction number 11 or that by giving of the instruction on disturbance of the peace quoted by the majority, standing alone, is error, the cases are legion to the effect that instructions, even in felony cases, will be read as a whole. (*People* v. *Honeycutt*, 29 Cal.2d 52, 62 [172 P.2d 698] ; *People* v. *Monteverde*, 111 Cal. App.2d 156, 168 [244 P.2d 447] ; *People* v. *Hunter*, 146 Cal.App.2d 64, 67 [303 P.2d 356].)

Free speech is no more precious than life or the liberty of which it is a manifestation. In *Honeycutt, supra,* defendant was convicted of first degree murder and sentenced to death. The court, speaking of an erroneous instruction, said: "But here, considering all the instructions together, and in the light of the evidence, we cannot say that in this case the jury

were misled by the erroneous instructions of which defendant complains. Upon any rational view of the evidence and instructions the verdict cannot reasonably be deemed to have been the result of a misconception of the law. Under such circumstances a reversal of the judgment is not required.'' (P. 62.)

Further, it is clear to me from the whole record that if the instruction on breach of the peace had been omitted and instruction number 11 had been given in lieu of or together with CALJIC 606, the result would have been the same. (*People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243]; *Fahey* v. *Connecticut*, 375 U.S. 85, 86-87 [84 S.Ct. 229, 11 L.Ed.2d 171]; *People* v. *Cockrell*, 63 Cal.2d 659, 669 [47 Cal.Rptr. 788, 408 P.2d 116]; Pen. Code, § 1404.)

There being no prejudice, the judgment of conviction on Count I should be affirmed.

A petition for a rehearing was denied April 28, 1966. Roth, P. J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied June 1, 1966.