Filed 8/28/15  P. v. Paz CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G051044 |
| v. | (Super. Ct. No. 14CF1341) |
| CESAR PAZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Cheri T. Pham, Judge.  Affirmed.

Melanie K. Dorian, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

We appointed counsel to represent Cesar Paz on appeal. Counsel filed a brief that set forth the facts of the case. Counsel did not argue against her client but advised the court she found no issues to argue on his behalf. Paz was given 30 days to file written argument on his own behalf. On June 23, 2015, his letter brief was received and filed by this court.

Counsel filed a brief following the procedures outlined in *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*). The *Wende* court explained a *Wende* brief is one that provides a summary of proceedings and facts but raises no specific issues. Under these circumstances, the court must conduct an independent review of the entire record. When the appellant himself raises specific issues in a *Wende* proceeding, we must expressly address them in our opinion and explain why they fail. (*People v. Kelly* (2006) 40 Cal.4th 106, 110, 120, 124.)

Pursuant to *Anders v. California* (1967) 386 U.S. 738 (*Anders*), to assist the court with its independent review, counsel provided the court with information as to issues that might arguably support an appeal. Counsel raised the following two issues: (1) whether Paz's conviction for assault with a deadly weapon was supported by substantial evidence; and (2) whether the trial court erred by not instructing the jury with CALCRIM No. 3477, on the presumption that the resident was reasonably afraid.

In his brief, Paz also argues the trial court erred by not instructing the jury with CALCRIM No. 3477. Paz adds that if he knew the court would not instruct the jury with CALCRIM No. 3477, he would have testified at trial. Paz also indicates he made several requests of his attorney that were unanswered, including requests related to the production of forensic evidence. Paz also states he told his attorney he wanted the defense investigator to testify. Lastly, Paz attached a list of cases addressing his claims.

We have reviewed the record in accordance with our obligations under *Wende* and *Anders*. We considered Paz's brief and the information provided by counsel. We found no arguable issues on appeal. The judgment is affirmed.

# FACTS

Paz met Moises Aguila in January 2014 through Johnny Martinez. At the time, Aguila was divorced and was staying with Martinez. At one point, Martinez's mother said she did not want guests at her house, and Aguila turned to Paz for help. Paz told Aguila that he could stay at his house for a couple days. Aguila accepted the offer and moved into the house that he later learned was occupied by Paz, his mother, and his brother Eddie Paz (Eddie). Paz's mother never gave Aguila permission to live there.

Aguila kept his personal belongings in Paz's room and in a shed in the yard. He usually slept on a blowup bed in the shed, but occasionally he slept in Paz's room and on the couch inside the house. Aguila would not enter the house unless someone was there. He was never given a set of keys. To get in the house, he used the keys that Eddie would leave for him in a hiding place. Aguila did not pay rent, but he helped with chores and drove Paz around. At trial, Aguila called Paz a good friend.

Aguila admitted his drug problem led to his divorce. And during the time he was living in Paz's house, he often smoked marijuana and methamphetamine in the shed with others who were also staying at the house. Aguila testified Paz was aware of this and never asked Aguila to stop or reported him to the police. Although Paz would be in the shed area while others were doing drugs, Paz did not do drugs. He just drank.

On the morning of April 17, 2014, Aguila was in the shed smoking methamphetamine. He believed Paz probably walked in. He did not recall Paz telling him to stop using drugs or asking him to leave his house but acknowledged Paz always told everybody to leave. About 10 or 11 p.m. that night, Aguila decided to head to his friend Martinez's house down the street. Aguila testified he left Paz's house on his own volition and not because Paz told him to leave.

3

At about 1 a.m., on April 18, 2014, Aguila was walking back to Paz's house with Martinez. He saw Paz standing by a tree near a bench inside his gated front yard speaking with a neighbor. As Aguila approached, Paz said something, but Aguila was not sure if the comment was directed at him. Aguila proceeded to walk onto the property and was in the process of unlocking the gate when Paz began yelling at him not to go in the house. Aguila and Paz began to swear at each other. Aguila testified that was how the two always talked to each other. Aguila said he was "'coming in anyway'" because he needed to get his personal belongings from the house, and then proceeded to unlock the top latch on the gate. Aguila had a week's worth of clothes inside the house and in the shed, although most of his property was elsehwere.

Aguila lowered his head to unlock the gate, and when he moved his head up, he suddenly heard whistling and felt his head burning. When he touched his head, he saw blood. He looked up at Paz and saw him holding a golf club. Aguila did not see the golf club before he was hit but believed Paz may have been hiding it behind his leg.

The attack surprised Aguila. When he left the house earlier that day, he and Paz were friendly and they joked around. After realizing he had been hit, Aguila yelled, "'Cesar, did you fucking hit me?'" Aguila started to fall back and Martinez helped him stay up. Aguila wanted to go after Paz, but Martinez stopped him. Aguila said to Martinez, "'[Did] you see what this motherfucker did to me?'" Aguila and Martinez walked back to Martinez's house, and Martinez called the police.

Shortly after, Officer Alejandro Partida responded to an assault with a deadly weapon call and was flagged down by Martinez. Aguila was sitting down in front of Martinez's house and holding a paper towel to the back of his head. Partida observed a cut on the back of Aguila's head, about three-quarter inches long.

4

Aguila told Partida he stayed at Paz's house and had his property there. Aguila said he was walking to the liquor store with a friend when he passed by Paz's house and saw Paz in the yard. Paz yelled and cursed at him. Paz yelled, "'I told you not to fucking come back to my house.'" Aguila ignored Paz and continued to walk past him on the sidewalk. Aguila told Partida he felt a hard hit on the back of his head, and when he had turned around, he saw Paz holding the golf club. Partida did not perceive Aguila to be "fuzzy" or "out of it" so Partida believed Aguila was able to make a statement.

After speaking with Aguila and Martinez, Partida drove his vehicle down the street to Paz's house. Partida announced himself as a Santa Ana police officer. Moments later, Partida observed individuals walking from the backyard. Other officers stopped the two individuals, later identified as Paz and his companion, at gunpoint, handcuffed them, and detained them. Partida recovered two golf clubs from the premises and showed them to Aguila and Martinez, who identified one of them as the weapon.

Partida questioned Paz "to get his side of the story." Paz told Partida that he was defending his property from drug users who were trespassing on his property. Paz confirmed Aguila was staying in his house and kept his property there, but he told the officers when Aguila approached the house that night he asked Aguila not to enter his property. He then refused to answer further questions.

Paz did not say anything about Aguila threatening him or carrying a weapon on his person. Paz appeared upset and only spoke with the officer for a couple of minutes before refusing to answer any more questions.

Aguila was taken to the hospital. There, Aguila spoke with an officer, and someone from Crime Scene Investigation photographed his head injury. Partida did not follow up with Aguila as to whether he had used drugs at Paz's house or whether he had attempted to trespass on Paz's property. During the course of the investigation, Partida did not see any signs that Aguila was intoxicated or under the influence of drugs. Partida did not conduct any investigation to find out whether Aguila or Martinez was under the

5

influence of or possessed any drugs as he "didn't feel the need" to do so. Aguila admitted he did not give the police officers any information about his alcohol or drug use that night. At trial, Aguila remembered telling Partida that he went to get cigarettes but denied telling the officers he was walking to a liquor store with Martinez to get cigarettes or that he had been hit on the head when walking past the house. Aguila admitted to having used alcohol and drugs the night of the incident, but he did not believe that use had affected his ability to perceive and recollect.

Aguila spoke to a defense investigator before trial on September 24, 2014. During the conversation, Aguila admitted to the investigator he had been asked to leave the house three times, probably by Paz, prior to that night. He testified that even though Paz would ask him to leave, Paz always let him return. So when Paz asked him to leave that day, he simply "brushed it off" because he "was there to protect [Paz's] mom" and did not believe Paz would strike him. He also admitted to the defense investigator that when he was trying to enter the gate that night, Paz told him not to come in. He likely said something like, "I'm going to come anyway." He described his verbal exchange with Paz as part of their routine "trash talk" and denied he had said or done anything to provoke Paz or that he had challenged him to a fight.

When he testified, Aguila was wearing a jail jumpsuit. He was serving a three-month sentence in the Orange County jail for a 2014 burglary and possession of stolen property conviction. Aguila received immunity from prosecution for crimes arising out of his testimony or other information given as long as it was the truth.

Paz did not call any witnesses. The defense requested the trial court instruct the jury with CALCRIM No. 3477. The court denied the request finding there was not substantial evidence to support giving the instruction. The court did instruct the jury on self-defense, CALCRIM No. 3470, the right to eject a trespasser, CALCRIM No. 3475, and the right to defend real property, CALCRIM No. 3476.

6

The jury convicted Paz of the sole count alleged against him, assault with a deadly weapon, a golf club (Pen. Code, § 245, subd. (a)(1), all further statutory references are to the Pen. Code).  The court sentenced Paz to the midterm of three years in prison and awarded him custody credits for 162 actual and 162 conduct days.  The court imposed the applicable fines and fees.  Paz filed a timely notice of appeal.[1]

DISCUSSION

First, Paz questions whether substantial evidence supports his conviction.  Next, Paz asserts the trial court erred by not instructing the jury with CALCRIM No. 3477.  We will address each in turn.

*Substantial Evidence*

"Evidence is substantial if it is reasonable, credible and of solid value. [Citation.]"  (*People v. Dunkle* (2005) 36 Cal.4th 861, 885, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  It is undisputed Paz hit Aguila on the back of the head with a golf club so substantial evidence questions are limited to whether there was substantial evidence to establish the elements of assault with a deadly weapon conviction, and if so, whether Paz was justified in hitting Aguila based on self-defense or defense of property.

Assault with a deadly weapon requires proof defendant wielded a deadly weapon.  (§ 245, subd. (a)(1).)  The commission of section 245, subdivision (a)(1), requires proof that a defendant committed assault with force likely to produce "great bodily injury," which is "bodily injury which is significant or substantial, not insignificant, trivial or moderate.  [Citation]"  (*People v. McDaniel* (2008)

---

[1]    On December 12, 2014, a month after the trial court sentenced Paz, the court conducted a hearing and determined Paz had the ability to pay for the preparation of the probation and sentencing report.  Paz did not file a timely notice of appeal from that order.  On May 21, 2015, Paz filed petition for writ of habeas corpus seeking relief from late filing of his notice of appeal (case No. G051954), which is pending.

7

159 Cal.App.4th 736, 748.)  Our Supreme Court has explained, as used in section 245, subdivision (a)(1), a "'deadly weapon'" is "'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' [Citation.]" (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029.) Accordingly, a golf club, while not deadly per se, may be a deadly weapon within the meaning of section 245, subdivision (a)(1), when used in a manner capable of producing and likely to produce great bodily injury.  In hitting Aguila on the head with the golf club, Paz used the golf club in a manner capable of producing and likely to produce, death or great bodily injury.  The injuries sustained by Aguila were significant and substantial.  The evidence supports all of the elements necessary to prove assault with a deadly weapon.

We turn to the issue of self-defense or defense of property.  "'To justify an act of self-defense . . . , the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him.  [Citation.]' [Citation.]  The threat of bodily injury must be imminent [citation], and '. . . any right of self-defense is limited to the use of such force as is reasonable under the circumstances.  [Citation.]' [Citations.]" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064-1065.)  The prosecution has the burden of proving, beyond a reasonable doubt, a defendant did not act in self-defense.  (*People v. Saavedra* (2007) 156 Cal.App.4th 561, 571.)

Paz did not testify he had an honest and reasonable belief that bodily injury was about to be inflicted upon him by Aguila.  And the facts in the record do not support an inference of such a belief.  Paz simply blindsided Aguila after a verbal exchange by hitting Aguila in the back of the head.

"'[T]he owner of property is justified in using force or a deadly weapon to eject a trespasser only *when it is manifest to one, as a reasonable person*, that injury to the property is contemplated, and that the owner is then entitled to use only such force as is *reasonably necessary* to justify the attack or to protect the property." (*People v. Miller*

8

(1946) 72 Cal.App.2d 602, 606.)  The use of excessive force, or an attempt to use excessive force, against a trespasser is unlawful.  (*People v. Heise* (1933) 217 Cal. 671, 673.)  There is no evidence in the record that suggests Paz acted in reasonable defense of his property.  Thus, we conclude substantial evidence supported Paz's conviction.

*Instructional Error*

Paz argues his yard was akin to his residence and because Aquila entered his yard without his consent, the trial court was required to instruct the jury with CALCRIM No. 3477.  Not so.

CALCRIM No. 3477 reads:  "The law presumes that the defendant reasonably feared imminent death or great bodily injury to (himself/herself) [, or to a member of (his/her) family or household,] if:  [¶] 1.  An intruder unlawfully and forcibly (entered/ [or] was entering) the defendant's home; [¶] 2.  The defendant knew [or reasonably believed] that an intruder unlawfully and forcibly (entered/ [or] was entering) the defendant's home; [¶] 3. The intruder was not a member of the defendant's household or family; AND [¶] 4. The defendant used force intended to or likely to cause death or great bodily injury to the intruder inside the home.  [¶] . . . [¶]  The People have the burden of overcoming this presumption.  This means the People must prove that the defendant did not have a reasonable fear of imminent death or injury to (himself/herself) [, or to a member of his or her family or household,] when (he/she) used force against the intruder.  If the People have not met this burden, you must find the defendant reasonably feared death or injury to (himself/herself)[, or to a member of his or her family or household]."

In *People v. Brown* (1992) 6 Cal.App.4th 1489 (*Brown*), the court held defendant was not entitled to CALCRIM No. 3477 based on section 198.5, the "Home Protection Bill of Rights."[2] In *Brown*, there was evidence the victim's entry onto defendant's front porch was unlawful and forcible, but the court held an entry onto a front porch did not constitute entry into a residence as required under section 198.5.

"'[A] trial court need give a requested instruction concerning a defense only *if there is substantial evidence to support the defense*.'" (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) "Although a trial court should not measure the substantiality of the evidence by undertaking to weigh the credibility of the witnesses, the court need not give the requested instruction where the supporting evidence is minimal and insubstantial." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1145, fn. omitted.) "Instructions only need be given where the 'evidence [is] substantial enough to merit consideration.'" (*People v. Hill* (2005) 131 Cal.App.4th 1089, 1101, overruled on other grounds in *People v. French* (2008) 43 Cal.4th 36, 48, fn. 5.) Here, relying on *Brown*, the trial court found a lack of substantial evidence to support the giving of CALCRIM No. 3477. We agree.

Paz asserts he only waived his right to testify because he thought the court would instruct the jury with CALCRIM No. 3477. Although jury instructions were finalized after Paz indicated he would not be testifying, nothing in the record suggests he made any attempt after the jury instructions were finalized to advise the trial court he wanted to testify. Paz does not explain why the court's decision not to give

---

[2] Section 198.5 provides: "Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred. [¶] As used in this section, great bodily injury means a significant or substantial physical injury."

CALCRIM No. 3477 made a critical difference in terms of his willingness to testify. We find no error in the court allowing the case to go to the jury without Paz testifying.

*Defense Counsel Failures*

Paz complains he "requested several things" from his counsel "for trial." He indicates his lawyer did not raise "D.N.A. or fingerprinting." There is nothing in the record that suggests evidence of either was available. Because identity of the perpetrator was not an issue at trial, we see no relevance even if such evidence was available.

Paz also states he wanted Aguila's "toxicology report, if one was available." Initially, we note the testimony of the police officers indicates no tests were taken to determine the toxicity of Aguila's blood. More importantly, Paz offers no explanation as to how such evidence would have helped him, and we cannot perceive any way in which this evidence would have benefited Paz at trial.

Lastly, Paz states he wanted the defense investigator to testify to impeach Aguila. The record demonstrates Aguila was impeached when defense counsel confronted him with his statements to the defense investigator. Testimony from the defense investigation was, therefore, unnecessary.

There is no reasonable probability that had defense counsel done any or all of the things Paz had requested that the result would have been more favorable for Paz. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 695.)

*Independent Review of the Record.*

Our independent review of the record pursuant to *Wende*, *supra*, 25 Cal.3d 436, and *Anders*, *supra*, 386 U.S. 738, including the possible issues raised by appellate counsel, has disclosed no reasonably arguable appellate issue.

11

## DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


ARONSON, J.